**FILED**

JAN 2 8 2008
1-28-2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| William D. Moore and Yvonne Moore, | ) |
| Plaintiff, | ) |
| | 08CV596 |
| vs. | JUDGE CASTILLO |
| | MAGISTRATE JUDGE SCHENKIER |
| Washington Mutual Bank FA, | ) |
| Defendant. | ) |
| | ) |
| | ) |

## COMPLAINT

The Plaintiff, William D. Moore and Yvonne Moore (the "Moore's"), against the Defendant, Washington Mutual FA ("WAMU"), as follows:

### PARTIES

1. The Moore's are individuals that currently reside at 6219 West Old Plank Blvd. Matteson, Illinois 60443 (the "Premises").

2. On information and belief, Defendant WAMU is a Washington corporation with its principle place of business located at 1301 2nd Ave, Seattle Washington. .

### JURISDICTION

This Court has jurisdiction over Plaintiffs' federal claims under RESPA, and the FDCPA pursuant to 28 U.S.C. §§ 1331, 1343 and 15 U.S.C. §§ 1692k, 2614, 1640(e), and the FHA Regulations, 24 C.F.R. Section 203.604, and 203.606. The Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

1

## VENUE

3.  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391.  The Defendant

WAMU has offices in this judicial district and regularly conducts business activities in

this judicial district.  Furthermore, a substantial part of the events giving rise to this

matter took place within this judicial district.

## GENERAL ALLEGATIONS

### Background

4.  On May 22, 2002, the Moore's entered into a mortgage agreement for the Premises (A

copy of the Moore's mortgage is attached as Exhibit A.), under loan number 2053118.

5.  As part of the terms of the agreement, WAMU agreed to be bound by certain federal

regulations governing HUD insured mortgages.  Section 9 (d) of the mortgage agreement

states in part:

> "Regulations of HUD Secretary.  In many circumstances regulations
> issued by the Secretary will limit Lender's rights, in the case of payment
> defaults, to require immediate payment in full and foreclose if not paid.
> This Security Instrument does not authorize acceleration or foreclosure, if
> not permitted by the Secretary"

6.  On or about December 2003, the Moore's mortgage became in arrears.

7.  On or about January 25, 2004, the Moore's sent various financial information to

WAMU in attempt to workout an arrangement to bring their account current.

8.  On  February 25, 2004,  The Moore's received a letter from WAMU which stated in

part:

> Thank you for your **continued interest** in our Homeowner's Assistance
> Program.  We acknowledge receipt of your financial package requesting
> consideration for a loan workout…To avoid delays, please return the
> following documents to us at 7301 Baymeadows Way, Jacksonville, Fl

32256 **within ten (10) days from the date of this letter…If we do not receive the requested documents, <u>we will assume</u> that you do not wish to take advantage of our Home Assistance Program or,** that you have made other arrangements to bring your account current.

9. The Moore's included a copy of their tax return in the financial package referenced in paragraph 8. above.

10. On March 12, 2004, WAMU sent a letter to the Moore's indicating that it needed the Moore's Profit and Loss Statement in order to complete the review of the Moore's financial information.

11. The Moore's attempted to contact WAMU, after they received WAMU's March 12, 2004 correspondence; however, the voicemail of Ms. R. Hahn at times would not accept additional voice messages.

12. After several attempts, the Moore's were finally able to reach a live person, and subsequently able to leave a message on Ms. Hahn's voicemail, however, by that time WAMU discontinued communication with the Moore's.

13. The WAMU filed a complaint to foreclose on the mortgage in the Circuit Court of Cook County under case number 04 CH 5399, on March 29, 2004, and subsequently after the foreclosure was filed, the account number on the Moore's loan was changed from 2053118 to 8420531181.

14. Defendant had a window of opportunity of approximately 17 days to attempt to gain clarification; however, WAMU's actions of filing a foreclosure complaint precluded the Moore's from obtaining an understanding of a Profit and Loss Statement (the Moore's Tax Return having been previously provided).

15. In the underlying case, the Moore's appeared in the action and complained that WAMU's foreclosure complaint should be dismissed because WAMU failed to follow HUD's regulations governing FHA insured Mortgages.

16. The Moore's filed a Motion to Dismiss the underlying foreclosure action and argued:

    (a).  that HUD regulations required Defendant to have a face-to-face interview with the Moore's before three months in installments became due, pursuant to 24 C.F.R. Section 203.604 (b) and 24 C.F.R. Section 203.604 (d),

    (b)  that WAMU failed to review its file before filing the mortgage foreclosure action to determine if it was in compliance with HUD's Regulations, pursuant to 24 C.F.R. Section  203.606(a)

    (c)  that WAMU failed to negotiate a repayment plan consistent with the Moore's circumstances to bring the account current, pursuant to FHA regulations.

    the Moore's filed a brief in support of their Motion to Dismiss.

16. On November 8, 2004, the matter was set for hearing and WAMU's foreclosure complaint was dismissed.

17. In addition to expending many hours of research and communicating with WAMU's attorneys, the Moore's appeared and/or filed correspondence in the underlying case approximately on ten or more occasions. Upon WAMU's filing of the foreclosure action, the Moore's became inundated with piles of junk mail (some of the mail being brought to them by their neighbors) regarding the foreclosure filed.  Ms. Moore became frightened and intimidated after process server banged on the door of the Moore's home and sat outside in front of the Moore's home for several hours.  Ms. Moore did not open the door

out of fear. WAMU's actions have caused the Moore's much embarrassment and mental distress.

18. On November 27, 2004 the Moore's forwarded additional financial documentation (37 pages which included financial worksheet, 2003 tax returns, bank statements, house leases for rental properties and pay stubs).

19. Notwithstanding the submission of such documentation, WAMU failed to respond to the Moore's, regarding the documentation.

20. The Moore's did not hear from WAMU until August 2, 2005 (almost a full year). The communication came in a form of a letter from WAMU's attorneys indicating that Defendant wanted to arrange a face-to-face meeting with The Moore's.

21. On August 6, 2005 the Moore's wrote to WAMU's indicating their willingness to meet with WAMU. However, when the Moore's were unable to arrange a meeting with WAMU's counsel via the telephone, the Moore's forwarded a second letter, on August 20, 2005 which contained a list of dates for the meeting.

22. Although the Moore's had a desire to meet with WAMU, the Moore's spoke with WAMU's counsel, Mike Papke, on multiple occasions. There were discussions between the parties about meeting in or around the courthouse, due to Mr. Papke having a "court call" (other pending cases) in the courthouse on a particular day. Additionally, there were discussions between the parties about meeting at WAMU's counsel's office in Northbrook. On one particular occasion, the parties were to meet, after Mr. Papke finished his court call (cases for the day). On the particular day, The Moore's, William Moore, placed a call to Mr. Papke, only to find out that he had left the Chicago area, and was traveling back to his office in Northbrook. On yet another occasion, Plaintiff,

William Moore, drove to Northbrook (on one of the dates listed on the August 20, 2005 correspondence), only to be told by Mr. Papke that they could not meet on that particular day, due to Mr. Papke's conflicting schedule.

23. On information and belief, the offices of WAMU's attorneys are more than 50 miles from the premises.

24. On information and belief, WAMU has branch offices which are closer to the premises than WAMU's attorneys; Northbrook office.

25. Notwithstanding  the Moore's attempts to meet with WAMU's attorneys, WAMU filed a second complaint to foreclose on the premises in December 28, 2005, under case number 05CH22395.

26. The Moore's again asserted their right to a face-to-face meeting with WAMU and right to have their file reviewed by WAMU prior to the filing of the second foreclosure action.

27. The Moore's again filed a Motion to Dismiss WAMU's foreclosure complaint.

28. The Moore's filed a brief in support of their Motion to Dismiss.

29. On June 1, 2006 The Moore's Motion to Dismiss was heard, and WAMU's foreclosure complaint was dismissed because of WAMU's failure to comply with HUD's servicing requirements.

30. The Moore's also appeared in the second foreclosure action, conducted research and expended multiple hours defending against the second foreclosure action and corresponding and communicating with WAMU's counsel.  WAMU's actions have caused the Moore's much embarrassment and mental distress.

31. At no time during the course of either foreclosure case did WAMU's counsel invite the Moore's to a specific location of a branch office of WAMU to discuss the Moore's financial situation. Notwithstanding this fact, on or about September 19, 2006, the Moore's received a letter from WAMU indicating that they were approximately $7,593.00 in arrears on their mortgage. The envelope in which the letter was mailed contained information on the outside of the envelope, which notified the general public that the Moore's were purportedly in default of their mortgage.

32. Because the Moore's were not aware that WAMU's had reinstated the mortgage, the Moore's wrote to WAMU on October 4, 2006, and requested information regarding the purported reinstatement.

33. WAMU's counsel sent letters to the Moore's on November 2, 2006, purportedly in response to the Moore's request, the letter did not state the terms upon which the Moore's mortgage was purportedly reinstated.

34. The Moore's reasoned from the ledger of account that WAMU advanced approximately $77,000 to The Moore's account, on August 28, 2006; however, they received no further explanation.

35. Because the Moore's were unable to receive a response from WAMU, The Moore's filed a complaint with the Department of Housing and Urban Development on or about November 2006. The complaint was transferred to the Illinois Department of Human Rights.

36. WAMU responded to The Moore's complaint and denied any wrongdoing or that it had violated the Fair Housing Act.

37. WAMU also stated that it advanced funds to the Moore's so that it could take away any technical defenses that the Moore's would have to a foreclosure complaint.

38. During that the Fair Housing Complaint was pending before the Illinois Commission on Human Rights, WAMU produced a letter which was purportedly given to the Moore's on January 8, 2004.

39. The Moore's challenged the validity of the letter stating the statements made in the letter were inaccurate, because the Moore's did not provide any financial data to WAMU prior or January 8, 2004. Moreover, the Moore's challenged the validity of the letter, because it included an account number that did not exist in 2004. As stated previously, the new account number of 8420531181 did not exist until sometime after the filing of the first foreclosure complaint. See copy of document attached hereto as Exhibit B.

40. On information and belief, WAMU, created the letter to protect itself from its loan servicing failures, and to further deny the Moore's the right to a workout agreement.

FEDERAL CLAIMS

## FIRST CLAIM FOR RELIEF
## VIOLATIONS OF THE FDCPA

41. The Moore's reallege and incorporate by reference all preceding allegations of law and

fact.

42. WAMU violated the FDCPA by its conduct, including but not limited to:

      a. attempting to collect amounts not permitted by law (15 U.S.C. § 1692f(1));

8

b. using unfair and unconscionable collection methods (15 U.S.C. § 1692f);

c. giving a false impression of the character, amount, or legal status of the alleged debt (15 U.S.C. § 1692e(2));

d. using false or deceptive collection methods (15 U.S.C. § 1692e(5));

e. failing to state "the amount of the debt" as required by 15 U.S.C. § 1692g(a)(1);

f. engaging in conduct the natural consequence of which is to harass, oppress or abuse borrowers (15 U.S.C. § 1692d);

g. failing to provide disclosures required by 15 U.S.C. § 1692e(11), including its advancement of funds without notifying the Moores.

i. sending notices or making communications that do not comply with the FDCPA.

43. As a result of WAMU's actions, the Moore's are entitled to relief under the FDCPA

and under state debt collection laws and regulations, including damages and a declaratory

judgment that WAMU's conduct violates the FDCPA.

## SECOND CLAIM FOR RELIEF
## VIOLATIONS OF RESPA

44. The Moore's reallege and incorporate by reference all preceding allegations of

law and fact.

45. WAMU violated RESPA by the following conduct:

a. failing to meet the requirements of 12 U.S.C. § 2605 regarding servicing and responding to qualified written requests;

46. As a result of WAMU's actions, The Moore's are entitled to relief under the RESPA,

including damages and a declaratory judgment that WAMU's conduct violates RESPA.

## THIRD CLAIM FOR RELIEF
## VIOLATIONS OF FEDERAL HOUSING REGULATIONS

47. The Moore's reallege and incorporate by reference all preceding allegations of
law and fact.

48. WAMU was required to meet with the  to have a face-to-face interview, or make a
good faith effort for the same with  the Moore's before three monthly installments
became past due, in one of its branch offices, pursuant to 24 C.F.R. Section 203.604 (b)
and 24 C.F.R. Section 203.604 (d),

49. WAMU was required to review its file before filing the mortgage foreclosure action
to determine if it was in compliance with HUD's Regulations, pursuant to  24 C.F.R.
Section  203.606(a).

50. WAMU was required to negotiate a repayment plan consistent with the Moore's
circumstances to bring the account current, pursuant to FHA rules.

51. WAMU failed to comply with HUD's regulations governing the Moore's FHA
insured mortgage.

52. As a result of WAMU's actions, The Moore's are entitled to relief,
including damages and a declaratory judgment that WAMU's conduct violates FHA
rules.

## FOURTH CLAIM FOR RELIEF
## BREACH OF CONTRACT

53. The Moore's reallege and incorporate by reference all preceding allegations of
law and fact.

54. WAMU services loans which are governed by HUD Regulations.

55. On multiple occasions WAMU has failed to service the Moore's loan as required by HUD's Regulations.

56. WAMU has failed to meet with the Moore's or made a good faith attempt to meet with the Moore's to negotiate a repayment plan consistent with the Moore's circumstances to bring the account current.

57. WAMU's agents failed and refused to meet with the Moore's at one of WAMU's branch offices.

58. As a result of WAMU's actions, WAMU has breached the contractual agreement between WAMU and the Moore's regarding the servicing of their loan.

59. WAMU's breach has caused the Moore's to expend various hours defending against the actions of WAMU.

## FIFTH CLAIM FOR RELIEF
## UNFAIR AND DECEPTIVE ACTS AND PRACTICES

60. The Moore's hereby incorporate by reference all preceding allegations of law and fact.

61. WAMU has engaged in unfair and/or deceptive acts and practices with respect to the Moore's that includes one or more of the following:

a. Failing to allow the Moore's to meet with loan personnel as required by HUD regulations;

b. Failing to respond timely or otherwise to the Moore's request for information    regarding;

c. Instituting foreclosure actions against The Moore's without first satisfying HUD's loan servicing requirements.

d. On information and belief, falsifying documents regarding the reason for WAMU's failure to reinstate the loan.

e. Improperly advancing funds on the Moore's account to cause payments to become due, without first notifying the Moore's and determining if Plaintiffs are able to make such payments.

h. Misleading or otherwise misinforming the general public about the legal status of the premises and the Moore's loan.

i. Attempting to collect a debt utilizing the legal system when it was inappropriate to do so.

j. Engaging in conduct that violates state and federal consumer protection laws; and

k. Harassing or otherwise treating the Moore's unfairly and without regard to obligations of good faith and fair dealing.

## FIFTH CLAIM FOR RELIEF

## INTENTIONAL MISREPRESENTATION

62. The Moore's reallege and incorporate by reference all preceding allegations of

law and fact.

63. WAMU has represented that it was entitled to Foreclose on the Moore's loan when

the same was not true.

64. WAMU's representations concerning that it wanted to meet with the Moore's were

false.

65. WAMU's unilateral advancement of funds was done so as to take away the Moore's right to meet with WAMU to discuss their financial situation and negotiate a repayment plan consistent with the mortgagor's circumstances

66. WAMU's representation that it denied the Moore's workout agreement in January 8, 2004 was false and on information and belief, WAMU padded or created a letter to make it appear that the Moore's loan workout agreement was denied, due to insufficient income.

67. WAMU's representation that it advanced funds on the Moore's account on August 1, 2006 was false, as WAMU's own records indicate that the purported advancement was made on August 28, 2006.

68. WAMU, knew or should have known that such representations were false.

69. The Moore's and others relied on WAMU's false representations concerning its entitlement to proceed to foreclosure, that a meeting would take place, that the Moore's workout plan was denied due to insufficient income, and that the Moore's account had been brought current and reinstated, to their detriment.

70. The Moore's reliance was reasonable or justifiable in the circumstances.

71. As a result of WAMU's misrepresentations, the Moore's have suffered damages, and are entitled to compensation.


## SIXTH CLAIM FOR RELIEF

## NEGLIGENCE/NEGLIGENT SERVICING


72. The Moore's reallege and incorporate by reference all preceding allegations of law

and fact.

73. WAMU owed the Moore's a duty of care with respect to servicing their mortgage loan for reasons including, without limitation, that the loan and FHA insured mortgage and was secured by an interest in Moore's residence and that lack of care would result the loss of their home causing great economic hardship. Moreover, the legislative purpose of the National Housing Act set forth in 12 U.S.S. Section 170(t), is to assist in providing a decent and suitable living environment for every American family. Thus the primary beneficiaries of the Act and its implementing regulations are those receiving assistance through its various housing programs, this would include the [Moore's], as mortgagors of a HUD insured mortgage (See *Banker's Life vs. Denton* 120 Ill. App 3d 576).

74. The duty of care required reasonable diligence, *inter alia,*
    a. to avoid having to Moore's travel great distances to meet with the lender;
    b. to give recipients of FHA insured mortgages to confidence in knowing that if the homeowner experiences financial hardship that the lender will make every effort to help them through their situation, knowing that the mortgage is being insured by the federal government.
    c. to ensure that that lenders do not falsify documents to satisfy their own interests
    d. to ensure that customer requests are properly and quickly responded to.

75. WAMU's conduct with respect to the Moore's and other similar situated WAMU FHA insured mortgage holders was far below applicable standards for mortgage loan servicing.

76. WAMU's conduct was negligent with respect to the Moore's.

77. WAMU's conduct was the proximate cause of damages to the Moore's.

78. The Moore's are entitled to relief for WAMU's negligence.

## SEVENTH CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY

14

79. The Moore's reallege and incorporate by reference all preceding allegations of law and fact.

80. WAMU assumed fiduciary duties with respect to monies it held in escrow for the Moore's.

81. WAMU assumed fiduciary duties with respect to servicing the Moore's' loan in compliance with HUD regulations.

82. On information and belief WAMU's fiduciary duty commenced when it agreed to lend money to the Moore's under a guarantee that in the event of default, WAMU's losses would be limited, because the mortgage was backed by HUD. The Moore's mortgage is insured by the Federal Housing Administration (FHA). The **National Housing Act of 1934** was passed during the Great Depression in order to make housing and home mortgages more affordable. It created the FHA and the Federal Savings and Loan Insurance Corporation.

83. WAMU breached its fiduciary duties by failing to properly service the Moore's loan.

84. WAMU breached its fiduciary duties by failing to respond to the Moore's request to meet and requests for information.

85. WAMU breached its fiduciary duty when it advanced funds on the Moore's mortgage account without meeting with the Moore's and explaining the terms of the reinstatement and without first ascertaining if the Moore's were able make payments under the new arrangement.

86. The Moore's were damaged by WAMU's breach of fiduciary duties, and are entitled to damages as a result of WAMU's breach.

87. The Moore's are entitled to relief for WAMU's breach.

15

## EIGHTH CLAIM FOR RELIEF

## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

88. The Moore's reallege and incorporate by reference all preceding allegations of law and fact.

89. The state of Illinois recognizes a duty of good faith and fair dealing with respect to conduct encompassed by contractual relations.

90. WAMU's conduct as aforesaid breaches said duty.

91. The Moore's are entitled to relief for WAMU's breach.

## EIGHTH CLAIM FOR RELIEF
## DECLARATORY AND INJUNCTIVE RELIEF

85. The Moore's reallege and incorporate by reference all preceding allegations of law and fact.

86. WAMU has engaged in and continues to engage in conduct that has a great probability of causing substantial and irreparable harm.

87. The Moore's are entitled to declaratory relief that WAMU's conduct is unlawful.

88. The Moore's are entitled to injunctive relief necessary to insure that such conduct will not continue into the future, and to provide uniform standards of conduct for servicing loans.

**Plaintiffs Request a Trial by Jury**

## PRAYER FOR RELIEF

Wherefore the Moore's request that this court award:
1. Actual, special, and general damages according to proof;

2. Statutory damages and penalties;

3. Restitution and disgorgement according to proof;

4. Injunctive relief against WAMU to ensure uniform standards of servicing conduct towards the Moore's, and to prevent future wrongful conduct;

5. Prejudgment interest at the maximum legal rate;

6. Punitive, exemplary and enhanced damages according to proof;

7. An accounting;

8. Declaratory Judgment as necessary to correct the wrongs inflicted on them;

9. Litigation Expenses and Costs of the proceedings herein;

10. Reasonable attorneys' fees; and

11. All such other and further relief as the Court deems just.

DATE: January 28, 2008

Respectfully Submitted,

William Moore and Yvonne Moore

William and Yvonne Moore
6219 W. Old Plank Blvd.,
Matteson, IL 60443
708-268-3495

When recorded mail to:
WASHINGTON MUTUAL BANK, FA
7757 BAYBERRY RD., 1ST FLOOR
JACKSONVILLE, FL 32256
ATTN CUSTODIAL LIAISON,
MAILSTOP MBCL3

0020613657

4137/0210 55 001 Page 1 of    7
2002-05-31  12:55:10
Cook County Recorder          33.00

0020613657

This instrument prepared by:
TOENNESSEN,ERIK
WASHINGTON MUTUAL BANK, FA
MIDWEST REGIONAL OPERATION CENTER
MILWAUKEE, WI 53222
TELEPHONE NO: (800)7630351

LOAN #: 2053118

---

FHA Case No.
137-1725993-703-203b

**State of Illinois**

# MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on **MAY 22, 2002.**    The Mortgagor is
**WILLIAM MOORE AND YVONNE MOORE HUSBAND AND WIFE**

("Borrower").

This Security Instrument is given to **WASHINGTON MUTUAL BANK, FA**

which is organized and

existing under the laws of **THE UNITED STATES OF AMERICA**
and whose address is **7301 BAYMEADOWS WAY, JACKSONVILLE, FL 32256**

("Lender").

Borrower owes Lender the principal sum of **\*TWO HUNDRED THIRTY SEVEN THOUSAND SIX HUNDRED SIXTY TWO AND NO/100\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** Dollars
(U.S.    **$237,662.00**    ). This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on
**JUNE 1, 2032.**                    This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to the Lender the following described property located in    **COOK**                    County, Illinois:
Initials:

FHA Illinois Mortgage - 4/96                    Page 1 of 6                    ILVFMADE                    ILLFMADE  909

**BOX 333-CTI**

Exhibit A

LOAN #: 2053118

SEE ATTACHMENT A.

which has the address of    6219 OLD PLANK ROAD, MATTESON

[Street, City],

Illinois        60443                              ("Property Address");
        [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Borrower and Lender covenant and agree as follows:

UNIFORM COVENANTS.
1.   **Payment of Principal, Interest and Late Charge.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note.

2.   **Monthly Payment of Taxes, Insurance and Other Charges.** Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required under paragraph 4. In any year in which the Lender must pay a mortgage insurance premium to the Secretary of Housing and Urban Development ("Secretary"), or in any year in which such premium would have been required if Lender still held the Security Instrument, each monthly payment shall also include either: (i) a sum for the annual mortgage insurance premium to be paid by Lender to the Secretary, or (ii) a monthly charge instead of a mortgage insurance premium if this Security Instrument is held by the Secretary, in a reasonable amount to be determined by the Secretary. Except for the monthly charge by the Secretary, these items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

Lender may, at any time, collect and hold amounts for Escrow Items in an aggregate amount not to exceed the maximum amount that may be required for Borrower's escrow account under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. Section 2601 *et seq.* and implementing regulations, 24 CFR Part 3500, as they may be amended from time to time ("RESPA"), except that the cushion or reserve permitted by RESPA for unanticipated disbursements or disbursements before the Borrower's payments are available in the account may not be based on amounts due for the mortgage insurance premium.

If the amounts held by Lender for Escrow Items exceed the amounts permitted to be held by RESPA, Lender shall account to Borrower for the excess funds as required by RESPA. If the amounts of funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may notify the Borrower and require Borrower to make up the shortage as permitted by RESPA.

The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument. If Borrower tenders to Lender the full payment of all such sums, Borrower's account shall be credited with the balance remaining for all installment items

Initials: (signature)

ILLFHADE

FHA Illinois Mortgage - 4/96                 Page 2 of 6

LOAN #: 2053118

(a), (b), and (c) and any mortgage insurance premium installment that Lender has not become obligated to pay to the Secretary, and Lender shall promptly refund any excess funds to Borrower. Immediately prior to a foreclosure sale of the Property or its acquisition by Lender, Borrower's account shall be credited with any balance remaining for all installments for items (a), (b), and (c).

3.   **Application of Payments.** All payments under paragraphs 1 and 2 shall be applied by Lender as follows:

First, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and

Fifth, to late charges due under the Note.

4.   **Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

5.   **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument (or within sixty days of a later sale or transfer of the Property) and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that requirement will cause undue hardship for Borrower, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall notify Lender of any extenuating circumstances. Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

6.   **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of condemnation, are hereby assigned and shall be paid to Lender to the extent of the full amount of the indebtedness that remains unpaid under the Note and this Security Instrument. Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order provided in paragraph 3, and then to prepayment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments, which are referred to in paragraph 2, or change the amount of such payments. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

7.   **Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.

If Borrower fails to make these payments or the payments required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.

Initials: WM YM

FHA Illinois Mortgage - 4/96                    Page 3 of 6                    ILLFHADE

LOAN #: 2053118

Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement, at the Note rate, and at the option of Lender, shall be immediately due and payable.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**8.    Fees.** Lender may collect fees and charges authorized by the Secretary.

**9.    Grounds for Acceleration of Debt.**

(a) **Default.** Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

(i)  Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

(ii)  Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

(b) **Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including Section 341(d) of the Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

(i)  All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

(ii)  The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.

(c) **No Waiver.** If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

(d) **Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

(e) **Mortgage Not Insured.** Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within 60 days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to 60 days from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

**10.    Reinstatement.** Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument. This right applies even after foreclosure proceedings are instituted. To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current including, to the extent they are obligations of Borrower under this Security Instrument, foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with the foreclosure proceeding. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument.

**11.    Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time of payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successor in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12.    Successors and Assigns Bound; Joint and Several Liability; Co-Signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9(b). Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property

Initials: _WM  YM_

FHA Illinois Mortgage - 4/96                                 Page 4 of 6                                                          ILLFHADE

20613657

under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. **Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

14. **Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

15. **Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

16. **Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 16, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 16, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

17. **Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall receive and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph 17.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

18. **Foreclosure Procedure. If Lender requires immediate payment in full under paragraph 9, Lender may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 18, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Paragraph 9, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Paragraph 18 or applicable law.**

19. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

20. **Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

Initials: ___

LOAN #: 2053118

21. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.
[Check applicable box(es)]

- [ ] Condominium Rider
- [ ] Graduated Payment Rider
- [ ] Growing Equity Rider
- [ ] Other(s) [specify]
- [ ] Planned Unit Development Rider

BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____

_____

_____
WILLIAM MOORE

_____
YVONNE MOORE

STATE OF ILLINOIS,                    Cook    County ss:

I, _____Neal W Caauwe_____ a Notary Public in and for said county and state do hereby certify that
_____William Moore and Yvonne Moore_____

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that _____they_____ signed and delivered the said instrument as _____their_____ free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this _____22nd_____ day of _____May 2002_____ .

My Commission Expires:                    _____
                                           Notary Public

OFFICIAL SEAL
NEAL W. CAAUWE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES JUNE 6, 2004

FHA Illinois Mortgage - 4/96                                                      ILLFHADE

20613657

**Washington Mutual**

January 8, 2004


WILLIAMS MOORE
YVONNE MOORE
6219 OLD PLANK BLVD
MATTERSON,IL. 60443


RE :8420531181

WE ARE A DEBT COLLECTOR.  THIS IS AN ATTEMPT TO COLLECT A DEBT, AND ANY
INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.


Dear:  Mr.&Mrs. Moore


Thank you for your continued interest in our Homeowner's Assistance Program.  We have received your request for
a loan workout and your supporting financial documentation. However, after completing our review and analysis,
your loan workout is being denied for the following reason(s):


**YOUR APPLICATION FOR HOME OWNERS ASSISTANCE IS BEING DENIED. YOUR INCOME
INSUFFICIENT TO SUPPORT ANY TYPE WORKOUT.**


If you have any further questions, or if your situation changes, please contact us toll-free at 1-888-743-7747 during
the hours of 8:00 a.m. (EST) and 4:75 p.m. (EST).

Sincerely,

Terry Dale
Homeowner's Assistance Department
Washington Mutual Bank, FA


Exhibit B