*MHN*

**F I L E D**
7-29-2008
JUL 2 9 2008 **RC**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

William D. Moore and Yvonne Moore.    )
    )
        Plaintiff,    )    Civil Action No. 08 C 596
    )
vs,    )
    )    Judge Castillo
    )    Magistrate Judge Schenkier
Washington Mutual Bank FA., f/k/a Homeside    )
Lending    )
    )
        Defendant,    )

### NOTICE OF FILING

> Glenn E. Heilizer
> Law Offices of Glenn E. Heilizer
> Five North Wabash Avenue, Suite 1304
> Chicago, IL 60602

PLEASE TAKE NOTICE that on **July 29, 2008** the undersigned caused to be filed a copy of plaintiffs' first amended complaint, a copy of which is served upon you.

One of Plaintiffs' Attorneys

### CERTIFICATE OF SERVICE

I, Alex Ogoke, certify that I served the above listed individual(s) the attached filings by mailing a copy to Defendant's attorney at the address listed above on **July 29, 2008.**

One of Plaintiffs' Attorneys

Cardinal Legal Group, P.C.
Attorney for Plaintiffs
Alex Ogoke, Esq.
100 W. Monroe Street, Ste. 711
Chicago, IL 60603
312-345-8580

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

F I L E D
7-29-→2008
JUL 2 9 2008   RC

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT.

| | | |
|---|---|---|
| William D. Moore and Yvonne Moore. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 08 C 596 |
| | ) | |
| vs, | ) | Judge Castillo |
| | ) | Magistrate Judge Schenkier |
| Washington Mutual Bank FA., f/k/a Homeside Lending | ) | |
| | ) | |
| | ) | |
| Defendant, | ) | |

## FIRST AMENDED COMPLAINT

The Plaintiffs, William D Moore and Yvonne Moore (the "Moore's), by and through their attorneys, Cardinal Legal Group, P.C. and Alex Ogoke, complain against the Defendant, Washington Mutual FA, f/k/a Homeside Lending ("WAMU"), as follows:

### PARTIES

1. The Moore's are individuals that currently reside at 6219 West Old Plank Blvd. Matteson, Illinois 60443 (the Premises").

2. On information and belief, Defendant, WAMU, is a Washington corporation with its principle place of business located at 1301 2nd Avenue, Seattle Washington.

### JURISDICTION

This Court has jurisdiction over Plaintiffs' federal claims under RESPA 12 U.S.C. 2605, and under Title VIII of the Civil Rights Act of 1968 (The Fair Housing Act Sec. 805 [42 U.S.C. 3605] and Sec. 818 [42 U.S.C. 3617]), pursuant to 28 U.S.C. Section 1331.

## VENUE

3. Venue is appropriate in this Court pursuant to 28 U.S.C. Section 1391. WAMU has

offices in this judicial district and regularly conducts business activities in this judicial

district. Furthermore, a substantial part of the events giving rise to this matter took place

within this judicial district.

## GENERAL ALLEGATIONS

### Background

4. On May 22, 2002, the Moore's entered into a mortgage agreement for the Premises (A

copy of the Moore's mortgage is attached as **Exhibit A**.), under loan number 2053118.

5. As part of the terms of the agreement, WAMU agreed to be bound by certain federal

regulations governing HUD insured mortgages. Section 9 (d) of the mortgage agreement

states in part:

> Regulations of HUD Secretary. In many circumstances regulations issued
> by the Secretary will limit Lender's rights, in the case of payment defaults,
> to require immediate payment in full and foreclose if not paid. This
> Security Instrument does not authorize acceleration or foreclosure, if not
> permitted by the Secretary"

6. On or about December 2003, the Moore's mortgage became in arrears.

7. On or about January 25, 2004, the Moore's sent financial information to

WAMU, in an attempt to workout an arrangement.

8. On February 25, 2004, The Moore's received a letter from WAMU which states in

part:

> Thank you for your **continued interest** in our Homeowner's Assistance
> Program. We acknowledge receipt of your financial package requesting
> consideration for a loan workout...To avoid delays, please return the
> following documents to us at 7301 Baymeadows Way, Jacksonville, Fl
> 32256 **within ten (10) days from the date of this letter...If we do not
> receive the requested documents, <u>we will assume</u> that you do not wish
> to take advantage of our Home Assistance Program or, that you have**

made other arrangements to bring your account current.

9.  The Moore's included a copy of their tax return in the financial package referenced in paragraph 8, above.

10.  On March 12, 2004, WAMU sent a letter to the Moore's indicating that it needed the Moore's Profit and Loss Statement in order to complete the review of the Moore's financial information.

11.  The Moore's attempted to contact WAMU, after they received WAMU's March 12, 2004 correspondence, however; the voicemail of Ms. R. Hahn at times would not accept additional voice messages.

12.  After several attempts, the Moore's were finally able to reach a live person, and were able to leave a message on Ms. Hahn's voicemail. However, by that time WAMU discontinued communication with the Moore's.

13.  On or about March 29, 2004, WAMU, through its attorneys, Fisher and Shapiro, LLC., filed a **first complaint to foreclose** on the mortgage in the Circuit Court of Cook County under case number 04 CH 5399, and subsequently **after the foreclosure was filed, the account number on the Moore's loan was changed from 2053118 to 8420531181.**

14.  The Moore's had a window opportunity of approximately 17 days to attempt to gain clarification. However, the Moore's did not receive a response from WAMU, regarding the request.

15.  In that case, the Moore's appeared in the action and complained that WAMU's foreclosure complaint should be dismissed because WAMU failed to follow HUD's regulations governing FHA insured Mortgages.

16.  The Moore's filed a Motion to Dismiss the foreclosure action and agued:

3

(a),  that HUD regulations required WAMU to have a face-to-face interview

with the Moore's before three months installments became due, pursuant to

24 C.F.R. Section 203.604 (b) and 24 C.F.R. Section 203.604 (d),

(b)  that WAMU failed to review its file before filing the mortgage foreclosure

action to determine if it was in compliance with HUD's Regulations, pursuant to

24 C.F.R Section 203.606(a)

(c)  that WAMU failed to negotiate a repayment plan consistent with the Moore's

circumstances to bring the account current, pursuant to FHA regulations,

the Moore's filed a brief in support of their Motion to Dismiss.

16.  On November 8, 2004, the matter was set for hearing and WAMU's foreclosure

complaint was dismissed.

17.  In addition to expending many hours of research and communication with WAMU's

attorneys, the Moore's appeared and/or filed correspondence in the underlying case

approximately on ten or more occasions.  Upon WAMU's filing of the foreclosure action,

the Moore's became inundated with piles of junk mail (some of the mail being brought to

them by their neighbors) regarding the foreclosure filed.  Ms. Moore became frightened

and intimidated after a process server banged on the door of the Moore's home and sat

outside in front of the Moore's home for several hours.  Ms. Moore did not open the door

out of fear.  WAMU's actions have caused the Moore's much embarrassment and mental

distress.

18.  On November 27, 2004, the Moore's forwarded additional financial documentation

(37 pages which included financial worksheet, 2003 tax returns, bank statements, house

leases for rental properties and pay stubs).

19.  Notwithstanding the submission of such documentation, WAMU failed to respond to

the Moore's regarding the documentation.

4

20.  The Moore's did not hear from WAMU until August 2, 2005 (almost a full year). The communication came in a form of a letter from WAMU's attorney indicating that WAMU wanted to arrange a face-to-face meeting with the Moore's.

21.  On August 6, 2005, the Moore's wrote to WAMU indicating their willingness to meet with WAMU.  However, when the Moore's were unable to arrange a meeting with WAMU's counsel via the telephone, the Moore's forwarded a second letter, on August 20, 2005 which contained a list of dates for the meeting.

22.  Although the Moore's had a desire to meet with WAMU, the Moore's spoke with WAMU's counsel, Mike Papke, on multiple occasions.  There were discussions between the parties about meeting in or around the courthouse, due to Mr. Papke having a "court call" (other pending cases) in the courthouse on a particular day.  Additionally, there were discussions between the parties about meeting at WAMU's counsel's office in Northbrook.  On one particular occasion, the parties were to meet, after Mr. Papke finished his court call (cases for the day).  On the particular day, the Moore's (William Moore), placed a call to Mr. Papke, only to find out that he had left the Chicago area, and was traveling back to his office in Northbrook.  On yet another occasion, Plaintiff, William Moore, drove to Northbrook in September of 2005, only to be told by Mr. Papke that they could not meet on that particular day, due to Mr. Papke's conflicting schedule.

23.  On information and belief, the offices of WAMU's attorneys are more than 50 miles from the premises.

24.  WAMU has branch offices which are closer to the premises than WAMU's attorneys' Northbrook office.

25.  Notwithstanding, the Moore's attempts to meet with WAMU's attorneys, Fisher and Shapiro, LLC, **filed a second complaint to foreclose** on the premise on December 28, 2005, under case number 05CH22395.

5

26. The Moore's again asserted their right to a face-to-face meeting with WAMU and right to have their file reviewed by WAMU prior to the filing of the second foreclosure action.

27. The Moore's again filed a motion to dismiss WAMU's foreclosure complaint.

28. The Moore's filed a brief in support of their Motion to Dismiss.

29. On June 1, 2006, the Moore's Motion to Dismiss was heard, and WAMU's foreclosure complaint was dismissed because of WAMU's failure to comply with HUD's servicing requirements.

30. The Moore's also appeared in the second foreclosure action, conducted research and expended multiple hours defending against the second foreclosure action and corresponding and communicating with WAMU's counsel. WAMU's actions have caused the Moore's much embarrassment and mental distress.

31. At no time during the course of either foreclosure case did WAMU's counsel invite the Moore's to a specific location of a branch office of WAMU to discuss the Moore's financial situation. Notwithstanding this fact, on or about September 19, 2006, the Moore's received a letter from WAMU's attorneys indicating that they were approximately $7,593.00 in arrears on their mortgage. The envelope in which the letter was mailed contained information on the outside of the envelope, which notified the general public that the Moore's were purportedly in default of their mortgage.

32. Because the Moore's were not aware of WAMU's purported reinstatement of the mortgage, the Moore's wrote to WAMU on October 4, 2006, and sent a qualified written request to WAMU, seeking information regarding the purported reinstatement and regarding the amount of charges purportedly due WAMU.

33. Although the Moore's received correspondence from WAMU's counsel, Fisher and Shapiro, LLC, WAMU did not respond to the Moore's request for reasons and clarification as to where the amounts originated. See 24 C.F.R. 3500.21 (e)(1), (e) (3) (only servicers of a mortgage servicing loan must respond to a qualified written request.)

34.   The Moore's reasoned from the ledger of account that WAMU advanced approximately $77,000 to the Moore's account, on August 28, 2006; however, they received no further explanation.

35. On October 13, 2006, the Moore's filed a complaint with the Department of Housing and Urban Development on or about October 13, 2006 to complain of WAMU's discriminatory conduct.   The complaint was transferred to the Illinois Department of Human Rights.

36. WAMU responded to the Moore's complaint and denied any wrongdoing or that it had violated the Fair Housing Act.

37. WAMU also stated that it advance funds to the Moore's so that it could take away any technical defenses that the Moore's would have to a foreclosure complaint.

38. During that the Fair Housing Complaint was pending before the Illinois Department of Human Rights, WAMU produced a letter which as purportedly given to the Moore's on January 8, 2004.

39. The Moore's challenged the validity of the letter stating the statements made in the letter were inaccurate, because the Moore's did not provide any financial data (after closing on their loan) to WAMU prior to January 8, 2004.   Moreover, the Moore's challenged the validity of the letter, because it included an account number that did not exist in 2004.  As stated previously, the new account number of 8420531181 did not exist

until sometime after the filing of the first foreclosure complaint. See copy of document attached hereto as **Exhibit B**.

40. On information and belief, WAMU, created the letter to protect itself from its failure to properly service the loan and to further deny the Moore's the right to a workout agreement.

41. While the HUD complaint was pending, WAMU failed to negotiate and/or meet with the Moore's to resolve the issues regarding the mortgage. The HUD complaint was dismissed on or about December 27, 2007.

42. On or about January 28, 2008, the Moore's filed a complaint against WAMU in the United States District Court for the Northern District Illinois, seeking damages against WAMU's for its violations.

43. On or about January 29, 2008, The Moore's sent another qualified request to WAMU seeking clarification as to how WAMU arrived at the payment amounts outlined in a letter from its attorneys, Fisher and Shapiro, LLC. The Moore's also sought copies of agreements from WAMU and documents related to the purported advancement of funds.

44. WAMU did not respond to Moore's request.

45. On March 20, 2008, Moore's sent a second letter asking for a response to their January 29, 2008 letter.

45. On or about March 26, 2008, WAMU, through its agent, Fisher and Shapiro, LLC., **filed a third Mortgage foreclosure complaint** against the Moore's under case number 08 CH 11441.

46. On March 28, 2008, Moore's sent a third letter asking for a response to their request for information requested in the January 28, 2008 letter.

47. On or about May 1, 2008, WAMU's counsel finally sent a letter to Moore's. But, WAMU did not provide a reason and/or explanation for the loan and payment amounts.

48. At all times material hereto, WAMU has failed and refused to provide an explanation to the Moore's regarding the payment amount and advanced funds, and has failed to comply with HUD guidelines governing FHA insured mortgages.

49. On information and belief, WAMU has concealed the nature of the advancement and loan terms in order to cause the Moore's default of the loan.

50. The Moore's seek to assert their rights under federal and other laws, however on information and belief, WAMU and their agents seek to prevent the Moore's from asserting their rights. On or about June 12, 2008, one of WAMU's agents told Plaintiff, William Moore, that his conduct of seeking to assert his rights reminded him of a **"person that kills their parents and then gets angry because the insurance company will not pay on the insurance policy."** The Moore's deem that conduct as harassment, unfair and malicious. However, it is consistent with the way in which they have been treated as they attempt to assert their rights.

51. WAMU engaged in a pattern and practice of concealing and/or altering information and/or failing to provide Moore's with information, in order to deny the Moore's their rights under FHA and other laws.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF RESPA

52. The Moore's reallege and incorporate by reference all preceding allegations of law and fact.

53. WAMU violated RESPA by failing to meet the requirements of 12 U.S.C. Section 2605 regarding servicing and responding to qualified written requests;

9

54.  As a result of WAMU's actions, the Moore's have been damaged by way of time reviewing and responding to and requesting documentation from WAMU and its agents. The Moore's have also incurred expenses (including but not limited to litigation costs and attorney fees) defending against WAMU's actions and otherwise asserting their rights. The Moore's have also suffered much embarrassment and have been caused to suffer mental anguish and stress as a result of WAMU's actions.  The Moore's are entitled to relief under the RESPA.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF THE FEDERAL FAIR HOUSING ACT

55.  The Moore's reallege and incorporate by reference all preceding allegations of law and fact.

56.  The Premises is a "dwelling" within the meaning of 42 U.S.C. § 3602(b).

57.  This claim is asserted pursuant to the Fair Housing Act, 42 U.S.C. 3605 and 42 U.S.C. § 3617, which provides:

> **Sec. 805. [42 U.S.C. 3605] Discrimination in Residential Real Estate-Related Transactions**
>
> In General.—It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.
>
> **Sec. 818. [42 U.S.C. 3617] Interference, coercion, or intimidation; enforcement by civil action**
>
> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 803, 804, 805, or 806 of this title.

58.  The Moore's race is black (African-American).

59.  WAMU violated 42 U.S.C 3605 and 42 U.S.C 3617 among other provisions of the Fair Housing Act by:

(a.)   Varying the terms of Moore's mortgage agreement by requiring the Moore's to have face-to-face meetings with WAMU's attorneys.

(b.)   Varying the terms of the Moore's mortgage agreement, by requiring the Moore's to meet with its attorneys in and around the courthouse of the Circuit Court of Cook County instead of one of WAMU's branch offices.

(c.)   Requiring the Moore's to drive to the Northbrook office (which is over 50 miles from the Moore's home) of WAMU's attorneys for a face-to-face meeting.

(d.)   Failing to send the Moore's a request to arrange a face-to-face meeting before three monthly installments became past due.

(e.)   Repeatedly ignoring the Moore's requests for information and request for a workout and other loan documentation.

(f.)   Causing them to run around to various locations for a face-to-face meeting other than the branch office of WAMU, in order to intimidate and harass the Moore's.

(g.)   Making rude and intimidating comments (as outlined in paragraph 50. above) to the Moore's regarding the Moore's actions of attempting to assert there rights, in order to intimidate and harass so that they would not assert their rights.

(h.)   Producing false and/or inaccurate documentation before the Illinois Human Rights Commission, regarding WAMU's purported denial of a workout agreement and/or reinstatement of the Moore's loan.

(i.)   Repeatedly denying the Moore's access to information regarding the loan account, from 2004 through the current date.

(j.)   Allowing its agents to harass and intimidate and cause Plaintiff, Yvonne Moore, to fear for her safety as a result of the conduct described in paragraph 17 above.

11

(k.)    Sending information regarding their loan, in envelope(s) designed to alert the general public that the mortgage was in default.

(j.)    Repeatedly filing foreclosure complaints against the Moore's, when WAMU and its agents knew, and should have known that they WAMU has not complied with FHA and RESPA Guidelines, in an attempt to harass and intimidate the Moore's into surrendering their home.

60.    As a result of WAMU's actions, the Moore's have been damaged by way of time reviewing and responding to and requesting documentation from WAMU and its agents. The Moore's have also incurred expenses (including but not limited to litigation costs and attorney fees) defending against WAMU's actions and otherwise asserting their rights. The Moore's have also suffered much embarrassment and have been caused to suffer mental anguish and stress as a result of WAMU's actions.

61.    WAMU engaged in a pattern and practice of continuing discriminatory actions and such actions of Defendant were intentional, willful, and taken in disregard for the rights of the Moore's

## PRAYER FOR RELIEF

Wherefore the Moore's request that this court award:

1.    Actual, special, and general damages according to proof for WAMU's unlawful conduct;

2.    Statutory damages and penalties;

3.    Injunctive relief against WAMU to ensure uniform standards of servicing conduct towards the Moore's and to prevent future wrongful conduct;

4.    Prejudgment interest at the maximum legal rate;

5.    Punitive, exemplary and enhanced damages according to proof;

6. An accounting;

9. Litigation Expenses and Cost of the proceeding herein;

10. Reasonable attorney's fees; and

11. All such other and further relief as the Court deems just.

**Plaintiffs Request a Trial by Jury**

DATE: July 29, 2008

Respectfully Submitted,

One of Plaintiffs' Attorneys

Cardinal Legal Group, P.C.
Attorney for Plaintiffs
Alex Ogoke, Esq.
100 W. Monroe Street, Ste. 711
Chicago, IL 60603
312-345-8580

13

# EXHIBIT A

When recorded mail to:
WASHINGTON MUTUAL BANK, FA
7757 BAYBERRY RD., 1ST FLOOR
JACKSONVILLE, FL 32256
ATTN CUSTODIAL LIAISON,
MAILSTOP BBCL3

**0020613657**

4137/0219 55 001 Page 1 of
2002-05-31 12:55:10
Cook County Recorder



00266 13657

This instrument prepared by:
TOWNSEND,ERIK
WASHINGTON MUTUAL BANK, FA
MIDWEST REGIONAL OPERATION CENTER
MILWAUKEE, WI 53222
TELEPHONE NO: (800)7630351

LOAN #: 2053118

CT of Nu.
720 44916/2022394
2of 2

FHA Case No.
137-1725993-793-203b

**State of Illinois**

# MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on MAY 22, 2002.    The Mortgagor is
WILLIAM MOORE AND YVONNE MOORE HUSBAND AND WIFE

("Borrower")

This Security Instrument is given to WASHINGTON MUTUAL BANK, FA

which is organized and

existing under the laws of THE UNITED STATES OF AMERICA
and whose address is 7301 BAYMEADOWS WAY, JACKSONVILLE, FL 32256

("Lender").
Borrower owes Lender the principal sum of *TWO HUNDRED THIRTY SEVEN THOUSAND SIX HUNDRED SIXTY TWO
AND NO/100**************************************************************** Dollars
(U.S.    $237,662.00 ). This debt is evidenced by Borrower's note dated the same date as this Security Instrument
("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on
JUNE 1, 2032.    This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by
the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest,
advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and
agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to the
Lender the following described property located in    COOK    County, Illinois

Initials: [signatures]

FHA Illinois Mortgage - 4/96    Page 1 of 6    YLVFRADB    ILLFHADE 909

**BOX 333-CTI**

# EXHIBIT
## A
exhibit

LOAN #: 2053118

SEE ATTACHMENT A.

which has the address of: 6219 OLD PLANK ROAD, MATTESON   [Street, City]

Illinois   60443   ("Property Address"):
          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Borrower and Lender covenant and agree as follows:

UNIFORM COVENANTS.

1.   Payment of Principal, Interest and Late Charge. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note.

2.   Monthly Payment of Taxes, Insurance and Other Charges. Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required under paragraph 4. In any year in which the Lender must pay a mortgage insurance premium to the Secretary of Housing and Urban Development ("Secretary"), or in any year in which such premium would have been required if Lender still held the Security Instrument, each monthly payment shall also include either: (i) a sum for the annual mortgage insurance premium to be paid by Lender to the Secretary, or (ii) a monthly charge instead of a mortgage insurance premium if this Security Instrument is held by the Secretary, in a reasonable amount to be determined by the Secretary. Except for the monthly charge by the Secretary, these items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

Lender may, at any time, collect and hold amounts for Escrow Items in an aggregate amount not to exceed the maximum amount that may be required for Borrower's escrow account under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. Section 2601 *et seq.* and implementing regulations, 24 CFR Part 3500, as they may be amended from time to time ("RESPA"), except that the cushion or reserve permitted by RESPA for unanticipated disbursements or disbursements before the Borrower's payments are available in the account may not be based on amounts due for the mortgage insurance premium.

If the amounts held by Lender for Escrow Items exceed the amounts permitted to be held by RESPA, Lender shall account to Borrower for the excess funds as required by RESPA. If the amounts of funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may notify the Borrower and require Borrower to make up the shortage as permitted by RESPA.

The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument. If Borrower tenders to Lender the full payment of all such sums, Borrower's account shall be credited with the balance remaining for all installment items

Initials: ___ ___

LOAN #: 2053118

(a), (b), and (c) and any mortgage insurance premium installment that Lender has not become obligated to pay to the Secretary, and Lender shall promptly refund any excess funds to Borrower. Immediately prior to a foreclosure sale of the Property or its acquisition by Lender, Borrower's account shall be credited with any balance remaining for all installments for items (a), (b), and (c).

3. **Application of Payments.** All payments under paragraphs 1 and 2 shall be applied by Lender as follows:

First, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and

Fifth, to late charges due under the Note.

4. **Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

5. **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument (or within sixty days of a later sale or transfer of the Property) and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that requirement will cause undue hardship for Borrower, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall notify Lender of any extenuating circumstances. Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

6. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of condemnation, are hereby assigned and shall be paid to Lender to the extent of the full amount of the indebtedness that remains unpaid under the Note and this Security Instrument. Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order provided in paragraph 3, and then to prepayment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments, which are referred to in paragraph 2, or change the amount of such payments. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

7. **Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.

If Borrower fails to make these payments or the payments required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.

FHA Illinois Mortgage - 4/96

Page 3 of 6

Initials: _____

ILS9ADE

2061 3657

LOAN #: 2053118

Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement, at the Note rate, and at the option of Lender, shall be immediately due and payable.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien, or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument. Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

8.   Fees. Lender may collect fees and charges authorized by the Secretary.

9.   Grounds for Acceleration of Debt.

(a)   Default. Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

(i)   Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

(ii)   Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

(b)   Sale Without Credit Approval. Lender shall, if permitted by applicable law (including Section 341(d) of the Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

(i)   All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

(ii)   The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.

(c)   No Waiver. If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

(d)   Regulations of HUD Secretary. In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

(e)   Mortgage Not Insured. Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within 60 days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to 60 days from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

10.   Reinstatement. Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument. This right applies even after foreclosure proceedings are instituted. To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current including, to the extent they are obligations of Borrower under this Security Instrument, foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with the foreclosure proceeding. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument.

11.   Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time of payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successor in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12.   Successors and Assigns Bound; Joint and Several Liability; Co-Signers. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9(b). Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property

Initials: ___

under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

14. Governing Law; Severability. This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note which can be given effect without applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

15. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

16. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 16, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 16, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

17. Assignment of Rents. Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph 17.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

18. Foreclosure Procedure. If Lender requires immediate payment in full under paragraph 9, Lender may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 18, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Paragraph 9, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Paragraph 18 or applicable law.

19. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

20. Waiver of Homestead. Borrower waives all right of homestead exemption in the Property.

Initials: _____

LOAN #: 2053118

21. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.
[Check applicable box(es)]

☐ Condominium Rider            ☐ Growing Equity Rider            ☐ Planned Unit Development Rider
☐ Graduated Payment Rider      ☐ Other(s) [specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.
Witnesses:

_____            _____
                                            WILLIAM MOORE

_____            _____
                                            TYRESE MOORE

STATE OF ILLINOIS,                    Cook    County ss:

I, _____Nell W Caaune_____ a Notary Public in and for said county and state do hereby certify that
_____William Moore and Tyrese Moore_____

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument, appeared before me this day
in person, and acknowledged that _____they_____ signed and delivered the said instrument as _____their_____
free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this ___22nd___ day of ___May 2003___

My Commission Expires:                        _____
                                               Notary Public

OFFICIAL SEAL
NEAL W. CAAUME
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES JUNE 6, 2004

FHA Illinois Mortgage - 4/96                                      ILLFHADE

2061 3657

STREET ADDRESS: 6219 WEST OLD PLANK ROAD
CITY: MATTESON                    COUNTY: COOK
TAX NUMBER: 31-20-307-006-0000

LEGAL DESCRIPTION:

LOT 19 IN RIDGELAND MANOR PHASE TWO, BEING A SUBDIVISION OF PART OF THE SOUTHWEST 1/4 OF
SECTION 20, TOWNSHIP 35 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY,
ILLINOIS

20613657

CLEGALD

**V̲ ̲̲hington Mutual**

January 8, 2004

WILLIAMS MOORE
YVONNE MOORE
6219 OLD PLANK BLVD
MATTERSON,IL. 60443

RE :8420531181

WE ARE A DEBT COLLECTOR. THIS IS AN ATTEMPT TO COLLECT A DEBT, AND ANY
INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Dear: Mr.&Mrs. Moore

Thank you for your continued interest in our Homeowner's Assistance Program. We have received your request for
a loan workout and your supporting financial documentation. However, after completing our review and analysis,
your loan workout is being denied for the following reason(s):

**YOUR APPLICATION FOR HOME OWNERS ASSISTANCE IS BEING DENIED. YOUR INCOME
INSUFFICIENT TO SUPPORT ANY TYPE WORKOUT.**

If you have any further questions, or if your situation changes, please contact us toll-free at 1-888-743-7747 during
the hours of 8:00 a.m. (EST) and 4:75 p.m. (EST).

Sincerely,

Terry Dale
Homeowner's Assistance Department
Washington Mutual Bank, FA



EXHIBIT

B